## JEFFERS v. UNITED STATES.
## JEFFERS et al. v. SAME.
### Nos. 11290, 11291.

Circuit Court of Appeals, Fifth Circuit.

Nov. 9, 1945.

Bart A. Riley and A. C. Dressler, both of Miami, Fla., for appellants.

Ernest L. Duhaime, Asst. U. S. Atty., of Miami, Fla., for appellee.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The defendant, Joseph Davis Jeffers, was convicted under the first count of an indictment charging the transportation of a Cadillac automobile in interstate commerce, knowing that the vehicle had been stolen in Los Angeles, California, and under the second count for receiving and concealing the same automobile. He was also indicted, together with Clinton Hummel and Sam King, for entering into a conspiracy to transport, and cause to be transported, in interstate commerce from the State of California to the State of Florida, the same automobile, well knowing the same to have been stolen. Both Jeffers and Hummel were convicted but King was acquitted.

In the conspiracy indictment Helen Veborg and Leota Mulkins were named as co-conspirators but were not indicted. The cases were consolidated for trial.

In the substantive case Jeffers was sentenced to three years on each count, the second to run concurrently with the first, and to pay a fine of $1,000, without costs. In the conspiracy case Jeffers and Hummel were each sentenced to imprisonment for one year, and the former's sentence was to run consecutively with the sentence imposed in the other case.

"Dr. Jeffers," as he referred to himself throughout the trial wherein he was attorney for himself and the codefendants, was the pastor, teacher, or spiritual factotum of Kingdom Temple, Incorporated, in Los Angeles, California, in which, according to the District Attorney's viewpoint, the fervor of his flock toward its shepherd was outweighed only by its gullibility in regard to him. The defendant, Clinton Hummel, was business manager of Kingdom Temple, Inc., and Leota Mulkins, one of the coconspirators, was secretary. Helen Veborg was a member of the flock, devoted to its principles and also to its pastor. In fact, there is testimony in the record that the

pastor had contemplated going into the desert for a sojourn with her for the high purpose of bringing into the world a holy child. The Doctor denied any such plan or purpose. Dr. Jeffers and the congregation of Kingdom Temple, Inc., considering that the word "God" was a relic of paganism, called the Creator "Yahweh."

It is not necessary to back-track the bizarre sequence of events any further than the date when Joy Jeffers, the third wife of Dr. Jeffers, sued him for a divorce and alimony, and obtained a decree which awarded to her the Cadillac automobile which is involved in these cases.

There were those in the congregation, including the Doctor, who asserted that the Cadillac automobile was the property of Kingdom Temple, Inc. It was familiarly known as the "golden chariot of Kingdom Temple," and there were those in the congregation who disliked the fact that Joy, the ex-wife, was in possession of this butane-driven vehicle. The automobile was not only the subject of much comment by members of the congregation, but it was the subject of prayer for divine guidance as to where lay the course of right and duty. Dr. Jeffers insisted that his former wife had promised to return the car, together with numerous suits of clothes. She not only failed to do this, but took the precaution of having the ignition lock changed. There was testimony that the Doctor even offered to buy it back from his former wife, thereby recognizing her legal right to it. It was put in evidence, too, that Joy wanted to make a trip to Utah before returning it. At the end of a resultful prayer service, according to the Doctor, revelations were made to certain persons present as to the whereabouts of the car and of the further fact that the keys were in it. But guidance came to the Doctor in a most direct and unusual way, according to his testimony, for as he prayed he held aloft the Holy Writ, and when he lowered the book at the conclusion of his invocation it opened at the eighth chapter of Acts wherein was recounted the occasion when Philip beheld an Ethiopian eunuch of great authority sitting in his chariot, and the Spirit had said unto Philip: "Go near, and join thyself to this chariot." [1] Be there those so skeptical as to doubt that this could have reference only to the "golden chariot of Kingdom Temple"? Was the pastor to be characterized as a conspirator and a thief because he followed what he interpreted as divine guidance and joined himself again to the golden chariot of the Temple? Without waiting for the dawn, he and several members of the congregation found the car in the driveway, even as it had been revealed to some of those present at the service. It was in the driveway at the home of Joy's sister, and keys were in the car, but they were keys that would not turn on the ignition. Undaunted and undismayed, they pushed the car into the street by manpower, and into Los Angeles, several miles away, by the use of another automobile. Keys that would unlock the ignition were made, a trailer was affixed, and Dr. Jeffers, Mr. Hummel, Mr. King, and the ladies, Miss Mulkins and Miss Veborg, set out on a tour of evangelism that led them across several state lines to the City of Miami, Florida, where they rented a residence and lived in unity. The Doctor and Miss Veborg were said to have gone under the name of Mr. and Mrs. Doubleday.

We are left somewhat uncertain as to the marital status of Miss Veborg, that is, as to whether or not she was married to the Doctor in actuality or only in a pantomimic ceremony. The Doctor's account of the episode is as follows:

"We had the ceremony at the home of Mr. and Mrs. Davis, with a number of bible students from various churches in the city, on June 13, 1944, next door to 540 Northwest 121st Street, the number being 536, I believe. We were all studying the Book of Revelations. Everyone wanted to know what it was about, and I said we would put on with our workers here a dramatization of the marriage of the Bride and Groom. Well, we had our uniforms, customary costumes and everything for that ceremony or dramatization, and everyone understood it apparently except Mrs. Garrett, and she told the neighbors that she understood it was a personal marriage ceremony between Miss Veborg and I because we took the parts of the bride and groom. And of course we did have refreshments at the end of the ceremony. We had no marriage ceremony there except as it is recorded here in the Book of Revelations. I will not read it here, but it is the 20th and 21st Chapters of the Book of Revela-

---

[1] Acts 8:29.

tions.[2]  There was no one told that this was a personal marriage between Miss Veborg and I; in fact, they were told definitely otherwise.  Miss Veborg had her own home and I had mine and everyone knew we were not husband and wife, and we never posed as such until about December 16, 1944."

The defendants insisted:  (1) That the chariot belonged to Kingdom Temple.  (2) That Joy Jeffers had agreed to return it and had failed.  (3) That the defendant, Jeffers, was unaware that the Court had awarded the car to his former wife.  (4) That his purpose in the repossession of the car had divine direction and was to the end that an evangelical tour for the spread of the gospel, which had long been planned, might be consummated.  (5) That his acts and doings were open and above-board, with no effort at concealment.  (6) That the use of another name by him was merely his nom de plume—a permissible and justifiable incognito—and was not for the purpose of deception.

■  There was evidence that he knew all about the divorce decree, having been served with a copy; that he undertook to buy the car from his wife and, having failed, stated to one or more that he intended to get it even if he had to steal it; that he had made an unsuccessful effort the night before it was taken to obtain it. There is ample evidence to support the verdict of the jury in each case and count, and it is not necessary that we decide any conflict between the commands of the secular law against one purloining the automobile of his divorced wife and the urge of divine guidance which the defendant asserts he was following in the taking of the car. The title to automobiles is governed by secular law, and it should also be noted that the Spirit did not direct Philip to take the eunuch's chariot.  But even if the Doctor did, in good faith, interpret the biblical reference to the chariot as divine directions to him to recover the automobile, such an interpretation could only relate to the question of intent, and this was a question for the jury.

  The efforts of Dr. Jeffers to show the transactions between him and the Motor Vehicle authorities and the O. P. A., after the taking of the automobile, might have had some bearing on the question of concealment of the car alleged in the second count of the substantive offense, but even if it had been error for the lower Court to exclude this evidence it was harmless.  Things done after the taking of the automobile could hardly justify the taking or support the taking in the face of the decree of the Court which awarded the car to his former wife.  Moreover, the sentence under Count 2, alleging concealment, ran concurrently with the sentence under Count 1, and the maximum sentence allowed by the statute was not inflicted under Count 1. Even if there were a reversal as to the conviction on Count 2 it would be of no avail to either defendant.

The judgments of the lower Court are affirmed.

---

[2] The 19th chapter of Revelation suggests itself as more appropriate to a dramatization of a marriage ceremony than does either the 20th or 21st chapter.

"Let us be glad and rejoice, and give honour to him: for the marriage of the Lamb is come, and his wife hath made herself ready.

"And to her was granted that she should be arrayed in fine linen, clean and white: for the fine linen is the righteousness of saints.

"And he saith unto me, Write, Blessed are they which are called unto the marriage supper of the Lamb." (Rev. 19:7-9.)